# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| United States of America, ) | |
| ) | |
|           Plaintiff, ) | |
| ) | |
| v. ) | Criminal Action Number |
| ) | 13-00213-01-CR-W-DW |
| Eric W. Quinn, ) | |
| ) | |
|           Defendant. ) | |

## REPORT AND RECOMMENDATION

Pending before the Court is the MOTION TO SUPPRESS EVIDENCE (Doc. #14) filed on January 9, 2014, by defendant Eric W. Quinn ("Quinn"). On February 25, 2014, the undersigned held an evidentiary hearing on Quinn's motion. Quinn was present and represented by his counsel, Assistant Federal Public Defender Laine Cardarella. The government was represented by Assistant United States Attorney Christina Tabor. At the evidentiary hearing, testimony was given by one witness: Officer Jose Madera with the Kansas City, Missouri Police Department. Additionally, the following exhibits were admitted into evidence:

| Number | Description |
|---|---|
| Gov't. #1 | Aerial map |
| Gov't. #2 | Dispatch recording |
| Gov't. #3 | Dispatch log |
| Gov't. #4 | Disc |
| Gov't. #5 | Dashcam video |

On the basis of all the evidence adduced at the evidentiary hearing, the undersigned submits the following:

## PROPOSED FINDINGS OF FACT

1. On May 9, 2013, Jose Madera was working as a patrol officer with the Kansas City, Missouri Police Department. Tr. at 5-6.

2. On that date, Officer Madera was in uniform in a marked police vehicle. Tr. at 6.

3. At approximately 2:30 a.m., Officer Madera responded to the area of 8th Street and Hardesty Avenue in Kansas City to assist other officers who were looking for suspects who had fled from a wrecked stolen vehicle. Tr. at 7-9.

4. Officer Madera was informed that several suspects had run from the wrecked vehicle, including at least two white males running northbound from the scene (one with a long ponytail and a white t-shirt and the other wearing a blue hoodie). Tr. at 8, 10, 20.

5. A bag with ammunition was found in the wrecked vehicle and a suspect who was immediately apprehended advised officers that one of the occupants that had been in the stolen vehicle may be armed with a handgun. Tr. at 29.

6. After a perimeter was established by officers at the scene, Officer Madera was assigned an area that was generally northwest of the location where the stolen car had come to rest. Tr. at 16, 18, 21.

7. Eventually, Officer Madera parked his patrol car at the corner of Denver and Independence Boulevard near a McDonald's restaurant. Tr. at 21-22, 51.

8. From this vantage point, at approximately 3:10 a.m., Officer Madera observed a white male in his mid-20s (later identified as Quinn) wearing a dark-colored t-shirt and jeans emerge from an alley near some duplexes in the area, walk on the sidewalk, and then start to cross the street. Tr. at 23-25, 27-29, 31, 52-53, 58.

9. Quinn was walking northbound but was "constantly looking over his left shoulder towards [Officer Madera's] direction." Tr. at 25-26, 53.

10. Upon seeing Quinn, Officer Madera decided to do a pedestrian check. Tr. at 25.

11. Officer Madera drove his patrol car near Quinn, exited the vehicle, approached Quinn and asked him his name. Tr. at 26.

12. Officer Madera also asked Quinn where he was coming from and Quinn stated that he had been dropped off at the McDonald's and then had walked to his aunt's house, but she was not answering her door. Tr. at 26-27.

13. Officer Madera believed that, from his vantage point at the corner of Denver and Independence Boulevard, he would have seen Quinn dropped off at the McDonald's if that had occurred. Tr. at 32-33.

14. While waiting for the officer who had seen the suspects flee from the stolen vehicle to arrive to determine if that officer could positively identify Quinn, Officer Madera handcuffed Quinn and performed a brief frisk of Quinn for purposes of officer safety and to prevent flight. Officer Quinn did not discover any weapons. Tr. at 29, 31.

15. Officer Madera then had Quinn stand in front of his police vehicle while Officer Madera got inside the vehicle to use his in-car computer to check Quinn's possible criminal history. Tr. at 33, 48.

16. When Quinn's identifying information was entered into the computer, Officer Madera was informed that Quinn had an outstanding Jackson County probation violation. Tr. at 34, 48.

17. The time period was approximately three minutes between when Officer Madera first spoke to Quinn and when he learned that Quinn had an outstanding arrest warrant. Tr. at 46-47.

18. At that point, Quinn was placed under arrest. Tr. at 34.

19. Officer Madera then asked Quinn if there was anything on his person that the officer needed to be aware of. Tr. at 34-35.

20. Quinn stated that he had a gun. Tr. at 34-35.

21. A search of Quinn's person revealed that he was carrying a handgun. Tr. at 35.

## PROPOSED CONCLUSIONS OF LAW

In his motion to suppress, Quinn argues that his detention by Officer Madera was unconstitutional and, consequently, the fruits of that illegal detention (Quinn's arrest and the search of his person that led to the discovery of a handgun) must be suppressed. To be sure, the Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. CONST. amend. IV. As made clear in the Fourth Amendment, though, the constitution does not forbid all searches and seizures, but only <u>unreasonable</u> searches and seizures. *Elkins v. United States,* 364 U.S. 206, 222, 80 S.Ct. 1437, 1446 (1960). Nonetheless, as the United States Supreme Court pointedly noted over one hundred years ago:

> No right is held more sacred, or is more carefully guarded, by the
> common law, than the right of every individual to the possession
> and control of his own person, free from all restraint or
> interference of others, unless by clear and unquestionable authority
> of law.

*Union Pacific Railroad Co. v. Botsford,* 141 U.S. 250, 251, 11 S.Ct. 1000, 1001 (1891).

In many search and seizure scenarios, the question of legal authority (as well as reasonableness) is presumptively satisfied by a judicially-issued warrant. However, over the years, many exceptions to the warrant requirement have been recognized. For instance, and pertinent to the issue in this case, in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868 (1968), the Supreme Court held that a law enforcement officer can stop and briefly detain a person for investigatory purposes, even without a warrant, if the officer has a reasonable suspicion – supported by articulable facts – that criminal activity "may be afoot," even if the officer lacks probable cause for an arrest. *Id.* at 30, 88 S.Ct. at 1884-85. However, the officer conducting such an investigatory stop must be able to articulate something more than an "inchoate and unparticularized suspicion or 'hunch.'" *Id.* at 27, 88 S.Ct. at 1883. Moreover, the mere fact that an officer's suspicion or hunch, in fact, was well-founded is <u>not</u> dispositive for a constitutional analysis, rather, the Fourth Amendment requires "some level of objective justification for making the stop." *INS v. Delgado,* 466 U.S. 210, 217, 104 S.Ct. 1758, 1763 (1984).

The concept of "reasonable suspicion" is not "readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 2329 (1983). In large part, common sense dictates the analysis of reasonable suspicion.

> The process does not deal with hard certainties, but with
> probabilities. Long before the law of probabilities was articulated
> as such, practical people formulated certain common-sense
> conclusions about human behaviors; jurors as fact-finders are
> permitted to do the same and so are law enforcement officers.

4

*United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695 (1981). As such, in evaluating the validity of a *Terry* stop, "the totality of the circumstances – the whole picture" must be considered. *Id.* at 417, 101 S.Ct. at 695. Moreover, it is well-settled that:

> [n]ot all personal encounters between law enforcement officials and citizens fall within the ambit of the Fourth Amendment. A consensual encounter between an officer and a private citizen does not implicate the Fourth Amendment.

*United States v. Jones,* 269 F.3d 919, 925 (8th Cir. 2001). The determination of when an encounter between law enforcement and a citizen rises to the level of non-consensual (and thus triggers the Fourth Amendment) is "a fact intensive one which turns upon the unique facts of each case." *Id.* Nonetheless, several matters have been considered by the courts and as summarized by the Eighth Circuit:

> Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen. Mere police questioning does not constitute a seizure, and so long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual. It is clearly not a seizure, for example, for an officer to approach an individual in a public setting, identify himself as a police officer, and ask the individual to step aside and talk to detectives. A request to see identification is not a seizure, as long as the police do not convey a message that compliance with their request[ ] is required. There is no *per se* requirement that an officer inform a citizen of his right to refuse consent, and there is no presumption that consent is invalid where given without an explicit notification of the right to refuse. That many people agree to speak with police when asked does not tend to suggest that reasonable persons do not feel free to decline. While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response.

*United States v. Vera,* 457 F.3d 831, 834-35 (8th Cir.2006) (*citations and internal quotations omitted*). Rather, "a person has been 'seized' within the meaning of the Fourth Amendment only

if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1872-73 (1980).

In the present case, while it may be arguable that the encounter between Quinn and Officer Madera was initially consensual, an investigatory detention occurred at least by the point that Officer Madera placed handcuffs on Quinn, thereby triggering Fourth Amendment scrutiny. The Government asserts that this "pedestrian check" or investigative detention is justified under a reasonable suspicion analysis. Consequently, the validity of the warrantless detention turns on an evaluation of the facts known to Officer Madera prior to the stop and whether those facts provide an appropriate level of <u>objective</u> justification that criminal activity might be afoot.

In this case, the Court finds that those facts known to Officer Madera do satisfy the test for reasonable suspicion:

(a) Officer Madera was in the area in response to suspects fleeing from a wrecked, stolen vehicle;

(b) The discovery of ammunition in the stolen vehicle and information from one apprehended suspect created a legitimate concern that the suspects would be armed;

(c) At least one of the suspects was noted to be a white male wearing a blue hoodie – an article of clothing easily discarded by a fleeing suspect;

(d) Quinn was a white male walking alone at 3:00 a.m. in the area where at least some of the suspects had been seen fleeing; and

(e) Quinn acted suspiciously upon seeing Officer Madera's patrol car.

These facts certainly would not justify an arrest of Quinn, but they are sufficient grounds for a prudent law enforcement officer to conclude that criminal activity might be afoot.

6

Concluding that the initial stop of Quinn satisfies *Terry* does not end the inquiry. It is well-settled that "[a] *Terry* stop that is supported by reasonable suspicion at the outset may nonetheless violate the Fourth Amendment if it is excessively intrusive in its scope or manner of execution." *El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 457 (8th Cir. 2011) (*quoting United States v. Johnson,* 592 F.3d 442, 451 (3rd Cir. 2010)). Thus, *Terry* creates a dual inquiry whereby a court must examine (1) whether the investigatory stop is lawful at the outset, and (2) whether the manner in which the stop was conducted "was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry,* 392 U.S. at 19–20, 88 S.Ct. at 1879. In this case, the propriety of the scope of the stop includes consideration of the manner of the stop (handcuffing Quinn) and the length of the stop.

With regard to the second prong of *Terry*, the Supreme Court has long recognized that an officer's right to conduct an investigatory stop inherently includes the right to use some degree of physical force or threat to effect the stop. *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 1872 (1989). To that end, "[t]he use of handcuffs is the use of force, and such force must be objectively reasonable under the circumstances." *Muehler v. Mena,* 544 U.S. 93, 103, 125 S.Ct. 1465, 1472 (2005) (Kennedy, J., concurring) (*citing Graham,* 490 U.S. at 397, 109 S.Ct. 1865). As such, courts have held officers may use handcuffs as a reasonable precaution to protect the officers' safety and maintain the *status quo* during the *Terry* stop. *United States v. Martinez,* 462 F.3d 903, 907 (8th Cir. 2006). However, "the use of handcuffs is greater than a *de minimus* intrusion and thus requires the [officer] to demonstrate that the facts available to the officer would warrant a man of reasonable caution in the belief that the action taken was appropriate." *El-Ghazzawy*, 636 F.3d at 457 (*quoting Lundstrom v. Romero,* 616 F.3d 1108, 1122 (10th Cir. 2010)).

To conduct a protective frisk under *Terry,* officers must have specific articulable facts, which, along with rational inferences, support a reasonable suspicion a suspect is potentially armed and dangerous. *United States v. Binion,* 570 F.3d 1034, 1039 (8th Cir. 2009). Similarly, "for the use of handcuffs during a *Terry* stop, the Fourth Amendment requires some reasonable belief that the suspect is armed and dangerous or that the restraints are necessary for some other legitimate purpose, evaluated on the facts of each case." *El-Ghazzawy*, 636 F.3d at 457 (*quoting Bennett v. City of Eastpointe,* 410 F.3d 810, 836 (6th Cir. 2005)).

In this case, under these facts, the Court concludes that Officer Madera's initial decision to handcuff Quinn was permissible and did not elevate the encounter to an arrest. More specifically, Officer Madera knew (in addition to the previously cited information):

(a) he was encountering Quinn at 3:00 a.m. without any other officers present, and

(b) he had information that the suspects from the stolen car incident could be armed and had been successfully eluding capture by fleeing from law enforcement officers.

Handcuffing Quinn for purposes of officer safety was reasonable under the circumstances. *Compare Martinez*, 462 F.3d at 907 ("Placing [the suspect] in handcuffs was a reasonable response to the situation in order to protect the officers' personal safety and to maintain the *status quo* [, as] such the use of handcuffs did not convert this *Terry* stop into an arrest.").

Finally, the Court does not find that the time of the detention was improper. After obtaining identifying information from Quinn, Officer Madera radioed for an officer who had seen the suspects fleeing from the stolen car to come to the scene to see if Quinn could be identified in connection with that crime. While waiting on that officer, Officer Madera ran Quinn's name through the police computer and learned that Quinn had an outstanding arrest warrant. The time lapse was only a few minutes.

Upon learning of the outstanding arrest warrant, Officer Madera had valid grounds to effectuate an arrest of Quinn. *Compare United States v. Willis*, 967 F.2d 1220, 1224 (8th Cir. 1992). Further, the valid arrest of Quinn authorized Officer Madera to search Quinn's person incident to the arrest. *United States v. Perdoma*, 621 F.3d 745, 750 (8th Cir. 2010). Moreover, Officer Madera's pre-*Miranda* question to Quinn as to whether there was anything on his person that the officer should be aware of was not improper. As stated by the Eighth Circuit in holding that a similar pre-*Miranda* question (and ensuing response) fell within the public safety exception to *Miranda*:

> Under the public safety exception, a suspect's answer may be admitted into evidence if it was obtained in response to a question asked in furtherance of public safety and not designed solely to solicit testimonial evidence, even if *Miranda* warnings had not yet been given. *Quarles,* 467 U.S. at 655-56, 659 & n.8, 104 S. Ct. 2626; *see United States v. Williams*, 181 F.3d 945, 954 n.13 (8th Cir. 1999). The exception does not depend upon the questioning officers' subjective motivation. Rather, it is judged under an objective standard and "applies when 'police officers ask questions reasonably prompted by a concern for the public safety.' " *Lidell,* 517 F.3d at 1009 (quoting *Quarles,* 467 U.S. at 656, 104 S. Ct. 2626). The public to be protected can include the officers themselves. *Id.* (citing *Quarles,* 467 U.S. at 658 n.7, 659, 104 S. Ct. 2626).

*United States v. Everman*, 528 F.3d 570, 572 (8th Cir. 2008).

Therefore, and in accordance with the foregoing discussion, it is

**RECOMMENDED** that the Court, after making an independent review of the record and applicable law, enter an order **DENYING** the MOTION TO SUPPRESS EVIDENCE (Doc. #14) filed on January 9, 2014, by defendant Eric W. Quinn.

Counsel are reminded that each has 14 days from the date of receipt of a copy of this report and recommendation to file and serve specific objections to the same. A failure to file and

serve timely objections shall bar attack on appeal of the factual findings in this report which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

*/s/ John T. Maughmer*
**John T. Maughmer**
**United States Magistrate Judge**
